UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

LUIZ ORTIZ,
Petitioner

v. Civil Action No. 03-12531-NG

EDWARD FICCO,
Respondent

# BRIEF AND RECORD APPENDIX FOR PETITIONER IN SUPPORT OF HABEAS CORPUS PETITION

Robert Y. Murray
Attorney for Petitioner
December 22, 2004

TABLE OF CONTENTS


TABLE OF AUTHORITIES ............................ii

ISSUE PRESENTED................................ 1

STATEMENT OF THE CASE.......................... 1

STATEMENT OF FACTS ............................ 2

ARGUMENT

WHERE THE ULTIMATE ISSUE WAS WHETHER THE DEFENDANT WAS FALSELY ACCUSED BY THE COMMONWEALTH'S SOLE IDENTIFYING WITNESS, ANNA TORRES, THE JUDGE COMMITTED REVERSIBLE ERROR IN ADMITTING POLICE TESTIMONY THAT TORRES HAD IDENTIFIED THE DEFENDANT BY NAME AT THE SCENE FOLLOWING THE INCIDENT, WHICH TESTIMONY WAS HEARSAY SUBJECT TO NO EXCEPTION.......................... 12

A. <u>Spontaneous Utterance</u>. ................ 14

B. <u>State of Police Knowledge</u>............. 16

C. <u>Prior Consistent Statement</u>............. 19

D. <u>Statement of Identification</u>. .......... 21

E. <u>The Prejudice in the Testimony</u>......... 25

F. <u>Federal Constitutional Error</u>... 28

CONCLUSION .................................30

ADDENDUM...................................31

RECORD APPENDIX ............................32

TABLE OF AUTHORITIES

Cases

Commonwealth v. Almeida,
42 Mass. App. CL. 607 (1997) .............................. 15

Commonwealth v. Barrett,
438 Mass. 788 (1994) ......................... ... 15

Commonwealth v. Bassett,
21 Mass. App. Ct. 713 (1986) ...................... 25

Commonwealth v. Beattie,
409 Mass. 458 (1991) ......................... 26

Commonwealth v. Binienda,
20 Mass. App. Ct . 756 (1985) .................. 20,21

Commonwealth v. Burnett,
417 Mass. 740 (1994)......................... 16

Comnonwealth v. Coplin,
34 Mass. App. Ct- 478 (1993) ................ 27

Commonwealth v. Daye
393 Mass. 55 (1984)............. 22,24,25,28

Commonwealth v. DiMonte
427 Mass. 233 (1998).. 14,15

Commonwealth v. Frangipane,
433 Mass. 527 (2001) ......................... 17

Commonwealth v. Geislcr,
14 Mass. App. Ct. 268 (1982) ................. 24

Commonwealth v. Grant,
418 Mass. 76 (1994) .......................... 16

Commonwealth v. Hardy,
47 Mass. App. Ct . 679 (1999).................., 16

Commonwealth v. Healy,
393 Mass. 367 (1984 )...........,........... 21

Commonwealth v. McLaughlin
43 Mass. 558 (2001) ......................... 16

Commonwealth v. Perez
27 Mass. App. Ct. 550 (1989) ................. 18

Commonwealth v. Peruzzi
15 Mass. App. Ct. 437 (1983) ................. 17

Commonwealth v . Rosario,
430 Mass. 505 (1999) .................. 18

Commonwealth v. Soto,
45 Mass. App. Ct. 109 (1998)................. 18

Commonwealth v. White,
370 Mass. 703 (1976) .................. 16

Idaho v. Wright,
497 U.S. 805 (1990)......................... 30

Ohio v. Roberts,
448 Mass. U.S. 56 (1980).............. 29

Osborne v. Boston Consol. Gas Co,
296 Mass. 441 (1937) ......................... 23

Sullivan v. Boston Elev. Ry. .
224 Mass. 405 (1916) ............... 23

Constitutional Provisions

Massachusetts Declaration of Rights

Article Twelve ..........

United States Constitution

Sixth Amendment

Fourteenth Amendment

Statutory Provisions

G.L. c.265, §.15A(b) 1
G.L. c.265, §18 (b). 1

ISSUE PRESENTED

Whether the judge committed reversible error in admitting police testimony that the Commonwealth's principal witness identified the defendant at the scene following the incident, which testimony was hearsay subject to no exception and which violates Petitioner's rights of confrontation and due process under the Sixth and Fourteenth Amendments to the United States Constitution and Article Twelve of the Declaration of Rights.

STATEMENT OF THE CASE

On October 15, 1999, the defendant, Luis Ortiz, was charged in two indictments with armed assault with intent to murder, G.L. c.265, §18(b), and assault and battery by means of a dangerous weapon, G.L. c.265, §15A(b)(R.3).[1] The defendant pleaded not guilty (R-1).

On May 30 and 31, 2000, the indictments were tried by a jury In the Worcester Division of the Superior Court Department (Fecteau, J., presiding). The jury returned verdicts of guilty(R.4) . The defendant was sentenced on the principal charge to a term of fifteen

---

[1]The record appendix is cited as "(R. )" and is set forth post. The transcript of the trial is cited by volume and page as "(Tr.

to twenty years, and on the lesser charge to a term of nine to ten years, the terms to be served concurrently at Massachusetts Correctional Institution, Cedar Junction (R.4).

The defendant's notice of appeal was filed on June 8, 2000 R.4). The appeal was entered in the Mass. Court of Appeals on April 18, 2001.

After briefing and arguments the Mass. Appeals Court on May 5, 2003 entered on the record a draft opinion affirming the Judgment of the Worcester Superior Court (R.5).

On November 25, 2003 Defendant's Petition for Habeas Corpus entered on the docket of the U.S. District Court for the District of Massachusetts (R.7).

Petitioner's Motion to Amend Petition allowed and Amended Petition entered on September 21, 2004 (R-9).

STATEMENT OF FACTS

This appeal arises out of an incident that occurred in Worcester on the afternoon of August 22, 1999, in which a seven-year-old girl was struck by gunfire directed at someone else. At trial, the parties presented very different theories of how the incident occurred and who committed the shooting. The ultimate question,

however, was whether the defendant was involved in the incident at all or whether he was falsely accused as a participant. The answer turned on the credibility of the Commonwealth's sole identifyinq witness, the victim's mother.

A. The Commonwealth's Case

The victim, Rakisha Perez, was not called to testify at trial. The Commonwealth's account of the incident was presented entirely through the victim's mother, Anna Torres who was the only person at trial alleged to be a percipient witness.

At the time of the incident, Torres was living with her longtime boyfriend, Frankie Perez, who was also her daughter's father (Tr.I/67-68). Perez had grown up in Great Brook Valley (Tr.I/115), which is a large public housing development (Tr.I/175-176), and the events in this case took place in that development.

1. Torres' Account

Torres first testified that on the day before the incident, August 21, 1999, she and Perez were standing outside with Perez's friends (Tr. I/68-69), whom she referred to as "his boys" (Tr.I/73, 110). According to Torres, they were approached by three men who pointed guns at them (Tr.I/68-73) and accused Perez of "shooting up" the home of someone's grandmother the previous day (Tr.I/72, 137). Torres

testified that she and Perez jumped in their car and drove away (Tr. I/73).[2]

The incident in this case occurred on August 22, 1999, near the apartment of Perez's mother, who lived at 3 Great Brook Valley (Tr.I/74-75) . On Torres' account, the incident occurred as follows. That afternoon, she and Perez left the apartment and began walking down an adjacent street (Tr. I/74-75), accompanied by one of Perez's boys, Manny Amaro (Tr. I/75, 155-1S6). At that time, her daughter was outside playing with friends (Tr. I/75, 146). As they walked down the sidewalk, Torres heard a horn and saw a car coming up behind them (Tr. I/76-77). In the car were three men, and the man in the front passenger seat was holding a gun out the window (Tr. I/76-79). The man fired the gun once and the shot struck the victim (Tr.

---

[2]During cross-examination, Torres asserted that shots were fired as they drove away, but conceded that there were no bullet holes in the car and that she did not call the police followinq this alleged episode (Tr. I/122-124, 130, 141).

I/79), following which the car hesitated briefly and then drove away (Tr. I/80-84).[3]

According to Torres, the men in the car were the same men involved in the episode the day before (Tr. I/69-70, 76-77). She testified that she had known each of the men for years (Tr. I/97-100), and claimed that the driver was the defendant (Tr. I/77), whom she knew by the name of Peter Malek (Tr. I/73, 90).

Following the incident, the first police officers arrived at the scene at 2:56 p.m. (Tr. I/174, 195-196). At 3:03 p.m. (R. 11), the victim was taken to the hospital and Torres went with her in the ambulance (Tr. I/90, 196). At the hospital, the victim was found to have only "superficial abrasions" (R.12).[4] The injuries were treated and the victim was then discharged at 4:00 p.m. (R.14), following which Torres returned to the scene (Tr. I/94).

---

[3]Torres claimed that the car was moving very slowly (Tr. I/79, 80, 149) , and that she saw the car from distances of six to twelve feet away (Tr. I/78-79, 81, 83) .

[4]Specifically, the victim had a one centimeter laceration on the inner side of her left arm and a two centimeter laceration on the outer side of her left chest (R. 9; Exhs. 204; See Tr. I/51).

2. <u>The Subsequent Events</u>

Detective William Hinson, the lead investigating officer (Tr. I/387), arrived at the scene at 3:30 p.m. (Tr. II/28,51). The detective testified that he spoke to Torres briefly (Tr. II/25-30), and that the conversation took place between 4:00 and 4:30 p.m. (Tr. II/45,51), which would have been after Torres returned from the hospital.[5] The evidence was conflicting as to whether Torres identified the alleged perpetrators to the detective in this conversation at the scene. That evidence is set forth in the course of the argument, <u>post</u>.

On the day after the incident, August 23,1999 (Tr. II/49), at 4:00 p.m.(Tr.II/30), Torres came to the police station and gave a statement about the incident (Tr. I/95,- II/36) . Torres testified that at that time, she gave the detective the names of the three men in the car, including that of the defendant

[5]At one point, she agreed with the prosecutor's suggestion that ahe spoke to the detective before going to the hospital (Tr. I/90). That could not have been the case on the chronology shown by the other evidence, as set forth above.

as the driver (Tr. I/96-97, 150).[6] On the second day after the incident, August 24, 1999 (Tr. II/44), Torres returned to the station and the detective showed her a single photograph of the defendant, whom she identified returned to the station and the detective showed her a single photograph of the defendant, whom she identified as Pete Malek (Tr. I/104-106,162,171-172; II/38-40, 44-45) .

At trial, Torres also made an in-court identification of the defendant as the driver of the car (Tr. I/107)and the man she knew as Pete Malek (Tr.I/73).[7]

B. The Defendant's Evidence

The defendant, presented evidence through cross-examination of the Commonwealth's witnesses, principally Anna Torres. That evidence was directed at the theory suggested in defense counsel's opening statement: that Torres' account of the incident had been

[6]Torres testified that she named the man in the passenger seat(the shooter) as Jimmy Saez and the man in the back seat as one Leo (Tr. I/96-97), as she also did at trial.

[7]During the remainder of its case, the Commonwealth presented police testimony that a search of the scene produced an empty shell casing (Tr: I/82-183; II/64) and a spent projectile (Tr. II/66, 70-71), both of which were fired from a .380 caliber semi-automatic gun (Tr. II/16). However, the Commonwealth offered no gun in evidence (see Tr. I/52) and presented no testimony linking the alleged perpetrators to a .380 caliber gun.

fabricated, and the defendant falsely accused, in order to protect the real shooter - Torres' boyfriend, Frankie Perez (Tr. I/62-65].[8]

On cross-examination, Torres confirmed that Perez was present at the time of the incident, as was Manny Amaro (Tr. 1/144-146, 155-156). The detective testified. however, that when he spoke to Perez at the scene following the incident, Perez "refused to tell me what happened," saying "his girlfriend could tell me" (Tr. I/54-55). Also, neither Torres nor Perez gave the police Manny's last name or address (Tr. I/157-160; II/50). Torres claimed not to know these facts (Tr. I/158-159), and as to Perez, she asserted the following: "Frankie doesn't have nothing to do with this. if he plead[s] the Fifth, he doesn't want to speak" (TR I/159)

As to her relationship with Perez, Torres testified that she had been with Perez for eight to ten years (Tr. I/68,115), that she loved Perez, and that she had his name tattooed on her arm (Tr. I/134). She agreed that Perez was present outside the courtroom,

[8] In his opening, defense counsel suggested that Perez, a drug dealer (Tr. I/55)had fired the shot during a dispute with Manny Amaro and had inadvertently hit the victim (Tr. I/62).

wearing a large gold chain (Tr. I/116,160). She claimed, however, that she did not know what Perez did for a living or whether he had ever had a job ("That's none of my business") (Tr. I/115, 116)[9]

As to possible bias against the defendant, Torres agreed that she had once been best friends with the defendant's niece (Tr. I/98), but that the friendship had ended because they "got into a fight" (Tr. I/131). Torres also acknowledged knowing the daughter of the defendant's girlfriend, and agreed that they were "not friends" (Tr. I/132). However, she denied that she had ever seen that girl with Perez, and denied that she does not like other girls hanging around Perez. ("Frankie goes out and does whatever he wants at night") (Tr. I/132-133).

On the ultimate issue, Torres denied identifying the defendant to the detective on the day after the incident "after [she] had an opportunity to talk things over with Frankie" (Tr, I/162,163). She did concede, however,

[9] Torres also attempted to prevent defense counsel from introducing a photograph of Perez in evidence (Tr. I/117-119). Defense counsel suggested that she and Perez don't like people learning too much about your business," to which Torres replied, "I really don't care" (Tr. I/119).

that she tries to do everything she can to help Perez ("Hey, he's my daughter's father") (Tr. I/109).[10]

C. The Closing Arguments

In his closing, the prosecutor argued that Torres' account of the incident was credible: "She took the stand and she testified as to what took place" (Tr. II/111, 116). The prosecutor thus contended, as Torres had testified, that the incident was a drive-by shooting and that the driver of the car was the defendant (Tr. II/113-114).[11]

---

[10]The defense also sought to show that two days after the incident Perez was found by police in possession of a .380 caliber semi-automatic gun (see Tr. I/65; II/57), which was the same type of gun as the one used in the incident (see ante at 6 n.7). Torres denied that Peres possessed such a gun at that time (Tr. I/165), and the shell casing found at the scene did not match any unidentified casing present in the police computer database (Tr. II/15-16, 20-22). The detective acknowledged, however, that he did not check to determine what .380 guns had been seized during the period following the incident (Tr. II/59-60).

[11]The Commonwealth proceeded against the defendant on theories of joint venture (Tr. I/54; II/117, 156) and transferred intent, the latter based on the theory that the intended victim was Perez (Tr. I/54; II/110, 112, 153).

In his closing, defense counsel pointed out that the Commonwealth's case rested "strictly [on] Anna Torres" (Tr. II/99), and argued that Torres' account was "not truthful" (Tr. II/102-103): "[N]o reasonable person can say (that] Anna is a truth teller" (Tr. II/106). Defense counsel argued, in substance, that Torres had falsely accused the defendant (Tr. II/97-98) and that she had done so for the purpose of "protecting" Frankie Perez (Tr. II/105). He told the jury that the question for decision was whether Torres was "telling the truth" (Tr. II/106) or, as he put it in his opening statement, "whether you ... are going to buy Anna Torres' story" (Tr. I/65).

## ARGUMENT

WHERE THE ULTIMATE ISSUE WAS WHETHER THE DEFENDANT WAS FALSELY ACCUSED BY THE COMMONWEALTH'S SOLE IDENTIFYING WITNESS, ANNA TORRES, THE JUDGE COMMITTED REVERSIBLE ERROR IN ADMITTING POLICE TESTIMONY THAT TORRES HAD IDENTIFIED THE DEFENDANT BY NAME AT THE SCENE FOLLOWING THE INCIDENT, WHICH TESTIMONY WAS HEARSAY SUBJECT TO NO EXCEPTION.

Torres' own testimony was conflicting as to whether she identified the alleged perpetrators to Detective Hinson at the scene following the incident. On direct, examination, she first testified that she did not identify the men to the detective at that time ("No, I didn't want to talk") (Tr. I/8,9; see I/150). She next testified that she did give the detective the men's names on that day (Tr. 1/89-90). On cross-examination, however, Torres unequivocally denied that she identified any of the men to the detective on that day ("No, I went [to the station] the next day") (Tr. I/150-153.) .

Thereafter, on re-direct examination of the detective, the prosecutor sought to show that Torres did identify the petitioner (and the other two men) at the scene following the incident. When the prosecutor first attempted to elicit this testimony, it was

excluded as hearsay, as follows;

> 0. During your conversation with [Torres at the scene] , did she identify the people that were involved in the shooting of her daughter?
>
> A. Yes, she did.
>
> (DEFENSE COUNSEL]: I object to the hearsay, Judge,
>
> THE JUDGE: Objection sustained.
>
> (Tr. II/26)

During the remainder of the examination, in a series of three bench conferences, the prosecutor suggested that the testimony was admissible on four separate theories. The judge made no ruling on two of these theories (spontaneous utterance and statement of identification, but admitted part of the evidence on another theory (state of police knowledge), and admitted all of the evidence on yet another theory (prior consistent statement). In the petitioner's view, the evidence was not admissible on any of these theories. The petitioner addresses the four theories in the order in which they were raised below.

A. Spontaneous Utterance:

Following the passage quoted above, the prosecutor elicited testimony from the detective that Torres was yelling and crying when he spoke to her at the scene (Tr. II/26-27). As to what she was yelling, defense counsel objected to the testimony, again as "hearsay" (Tr. 11/27) . A bench conference ensued, at which the prosecutor offered the testimony as a spontaneous utterance, and defense counsel reiterated his objection (Tr. II/27). The judge concluded that the prosecutor needed to lay "some more foundation" and made no ruling on this theory at that time.

Thereafter, however, the prosecutor never offered the testimony on this theory again. Indeed, at a later bench conference (the third), the judge observed that the prosecutor had "shifted [this] focus a bit away from the excited utterance" ("I noticed that you shied away from that [theory]") (Tr. II/42-43).

Consequently, the judge never made any rulinq whether or not the evidence qualified as a spontaneous utterance, a determination which the cases leave to the judge's "broad discretion. " Commonwealth v. DiMonte. 427 Mass. 233, 236 (1998). In fact, the judge not only

made no discretionary determination that the evidence did so qualify, but ultimately noted that he was having "trouble" determining whether Torres, by the time she spoke to the detective, was "[any] longer under the influence of the exciting event" (Tr. II/42).

In these circumstance the exception cannot properly be invoked on appeal, "Since the judge did not admit [the evidence] under this exception]," there is no Indication whether he would have determined the qualifying facts, and he "might well have determined that [the evidence] was inadmissible." Commonwealth v. Almeida, 42 Mass. App. Ct. 607, 614-615 (1997). See Commonwealth v. DiMonte. supra. at 240 n.10. See also Commonwealth v. Barrett. 418 Mass. 788, 795-796 (1994) (where judge made no ruling on threshold discretionary issue, "we are unable to ascertain how the judge would have ruled on the admissibility of the [evidence]").

The spontaneous utterance theory therefore provides

no basis for upholding the admission of the challenged evidence."[12]

B. State of Police Knowledge

In his next attempt to elicit this evidence, the prosecutor asked the detective "what were the street names" that he sought to identify following the incident, when he returned from the scene to the station (Tr.II/30), Defense counsel again objected and, at a bench conference (the second), again specified the ground of the objection as hearsay ("[This] really imports that hearsay into the substance of his testi-

[12]The evidence was not admissible under this exception as a matter of law. The time elapsed between the event and the asserted statement in this case - a period of at least 1-1/2 hours (see ante at 4-5 -- is at the outer limits of the case law dealing with statements made by adults. Compare Commonwealth v. Grant, 418 Mass. 76, 80-82 (1994)(1 hour lapse, upholding Judge's admission of statement) with Commonwealth v. Burnett, 417 Mass. 740, 743, 745 (1994) (1 1/2 hour lapse, upholding judge's exclusion of statement), both discussed in Commonwealth v. Hardy. 47 Mass. App. Ct. 679, 683-686 (1999). In addition, the Exception must be carefully applied where, as here, there is affirmative reason to believe that the declarant had a motive to lie. See Commonwealth v. White, 370 Mass. 703,713 (1976). See also Commonwealth v. McLaughlin, 433 Mass. 558, 565 (2001)

mony here") (Tr. II/31). The judge suggested that the testimony was admissible to show what information the police received, in order to "explain why they did what they did" (Tr. II/31-32). Defense counsel disagreed, but the judge allowed the prosecutor to ask the detective, "Did you receive some names" (Tr. TI/32) The prosecutor then continued the examination as follows:

> Q. Officer Hinson, at this point did you receive some names;
>
> A. I had the names, yes.
>
> 0. What were those names?
>
> A. One was Lolo; one was Jimmy Saez, or Zayes; and one was Pete Malek.
>
> (Tr. II/33)[13]

[13]The prosecutor's second question above exceeded the inquiry authorized by the judge at the bench conference. Although defense counsel did not object to that question, he had already objected to the evidence of the names allegedly received at the scene on numerous occasions and three times as "hearsay" (Tr. II/26,27 31). Thus, the Judge was amply alerted to defense counsel's view that the evidence was inadmissible. See Commonwealth v. Frangipane, 433 Mass. 527, 536-537 (2001); Commonwealth v. Peruzzi, 15 Mass. App. Ct. 437, 439 n.2 (1983).

The evidence was not admissible to show the state of the police knowledge. Under that doctrine, a police witness may testify that he received information in a conversation and then did something "as a consequence" (or words to that effect) .. but only if he does so "without further detail," -i.e., without "giving] the conversation itself." Commonwealth v. Perez, 27 Mass. App. CT. 550, 555 (1989), approved in Commonwealth v. Rosario, 430 Mass. 505, 509-510 (1999). This is because "the specify details [of the conversation] are seldom needed and present the likelihood of serious prejudice." Commonwealth v. Soto. 45 Mass. App. Ct. 109, 113 (1998).

Here, since the detective's testimony did include the details of the out-of-court conversation, it was not admissible as non-hearsay under the police knowledge doctrine. See Commonwealth v. Rosario, supra. at 511. (so holding as to testimony showing name of suspect identified in conversation, which "extended well beyond [the] permissible scope" of this doctrine).

C. Prior Consistent Statement

The evidence admitted thus far did not show explicitly that the detective received the names from Torres. During a subsequent bench conference (the third), the prosecutor argued that the evidence of Torres' identifications at the scene was admissible as a prior consistent statement, and the judge agreed (Tr. II/42-43). Defense counsel did not formally object at that time, stating that the prosecutor should first establish a timeframe and raising the possibility of a limiting instruction "[i]f it goes in" (Tr.II/43). Defense counsel did, however, object during the ensuing examination, when the prosecutor reached the matter in question:

> O. . . . [Between 4:00 and 4:30 p.m.) did she tell you what took place?
>
> A. Yes, she did.
>
> Q. What did she tell you?
>
> [DEFENSE COUNSEL]: Well, I object Judge.
>
> THE COURT: Objection sustained.

0. Did she tell you the persons that were involved in this incident --

A. Yes, she did.

Q. -- with her daughter? What were the names that she told you?

A. Lelo, Jimmy Saez or Zayes, and Peto Malek.

Q. Did she describe to you what role each of these individuals played?

A. Yes, she did.

Q. And what role did each of these individuals play as she told it to you at that time?

[DEFENSE COUNSEL]: Judqe, I object to the hearsay.

THE COURT: Overruled. He may answer.

A. Lelo was in the back seat, Pete Malek was the driver, and Jimmy Saez or Zayes was the front seat passenqer who fired the shot.

(Tr. II/45-46)

This evidence was not admissible as a prior consistent statement. Such a statement is only admissible to rebut a claim of recent, fabrication, and only if the statement was made before the alleged motive to fabricate arose. Commonwealth v. Binienda, 20 Mass. App. Ct. 756, 758-759 (1985). Here, the defendant did claim

that Torres' accusation of the defendant was fabricated but made no claim that it was fabricated recently. See Commonwealth v. Healy, 393 Mass. 367, 384(1984). Rather, on the defendant's theory, Torres' motive to fabricate -- her desire to protect the real perpetrator, her boyfriend Frankie Perez -- arose at the time the shooting took place, and thus already existed at the time she first spoke to the detective. Therefore, Torres' accusation of the defendant at that time was "made after and not before the alleged motive to falsify came into existence." Commonwealth v. Binienda, supra, at 759 (emphasis original), citing Commonwealth v. Healy, supra, (both holding statements made following incident inadmissible where alleged motive to fabricate arose at time incident occurred).

As a result, Torres' alleged identification of the defendant at the scene was not admissible through the detective as a prior consistent statement.

D. Statement of Identification

At one point during the third bench conference, the prosecutor suggested that the evidence was also admissible as a statement of identification (Tr. II/41). The judge made no ruling on that theory and, in the circumstances presented here, the evidence was not admissible on that theory.

Evidence of an out-of-court identification is only admissible through a police witness if the identifying witness herself acknowledges making the identification. Commonwealth v. Daye. 393 Mass. 55, 60-61 (1984). Where the identifying witness denies making the identification, police testimony that she did is not admissible because its "probative worth is outweighed by 'the hazard of error or falsity.." Id. at 61 citation omitted).

Here, Torres initially denied making any identification of the alleged perpetrator, to the detective at the scene ("No, I didn't want to talk") (Tr. I/89). And while she subsequently claimed that she did give the detective the names on that day (Tr. I/89-90), she ultimately negated that claim. On cross-examination, Torres flatly denied making any identification on that day, even though defense counsel focused her attention directly on the point, as follows:

Q. And you told [the prosecutor] that he asked you -- well. Detective Hinson asked you questions about how it happened, right?

A. The same day, right there?

Q. Right there.

A. Yeah, when I came back, I think, I'm not sure if it was when I came back from the hospital or before I left.

Q. And you told us earlier that you did not talk to Hinson at first, is that correct?

A. Yeah I didn't tell him anything about what was going on. I didn't want to tell them who did it or nothing. I didn't want to deal with it. I wasn't in the mood

0. Right, but some hours later you had some names for him; is that correct?

A- No. I went the next day

Q- The next day you had some names for Officer Hinson?

A. The next day I gave them the description, I told him who did it.

Q. The next day you gave some named to Officer Hinson, right?

A. Yes.

(Tr. I/150-151) (emphasis added)

By this testimony, Torres effectively retracted or repudiated her earlier testimony on direct, Sullivan v. Bos. Elev. Ry, 224 Mass. 405 406 (1916), thus leaving before the jury only her denial that she identified the alleged perpetrators to the detective at the scene. For a case involving a very similar sequence of testimony, see Osborne v. Boston Consol. Gas Co., 296 Mass. 441, 443-444 (1937), in which the

Court concluded as follows: "The case at bar is not distinguishable from Sullivan.... It is a clear example of a case where a witness, having made two materially different statements touching the same event, finally adheres definitely to one in preference to the other as being the truth, and is bound by the statement adhered to." Id. at 444[14]

Since Torres thus denied making any identification of the defendant to the detective at the scene, the detective's testimony to the contrary was not corroborative and, therefore, was not admissible to show that Torres did make an identification at that time. Commonwealth v. Daye, supra, 393 Mass. at 61-62. See Common-

[14]While Torres was not asked in terms to make a "choice" between her conflicting statements, Common - wealth v. Geisler, 14 Mass. App. Ct. 268, 273 n.6 (1982), she was certainly asked to do so in effect. As shown above, defense counsel began this passage by drawing Torres' attention specifically to what "you told the prosecutor]" on direct, which he did not once but twice. Nonetheless, Torres unequivocally negated her earlier testimony on direct ("No, I went the next day"), and she then adhered to that position even though defense counsel put the question back before her a second time and then a third, by way of confirmation. In these circumstances, Torres made a definite choice between her differing statements on the point.

wealth v. Bassett, 21 Mass. App. Ct. 713, 718-720 (1986) (same, regardless of fact that witness made in-court identification of defendant). As a result, the challenged testimony of the detective was simply "hearsay," Commonwealth v. Daye, supra, at 60 n.8, as defense counsel objected on four occasions below (Tr. II/26, 27,31,46)[15]

The detective's testimony therefore was not admissible as a statement of identification.

E. The Prejudice in the Testimony

The ultimate question for the jury in this case was whether the defendant was involved in the shooting incident at all. The Commonwealth's sole witness on

[15]In addition, while Torres did acknowledge identifying the defendant at the station the following day, the detective's testimony that she did so at the scene shortly after the incident was not admissible as corroborative of the acknowledged identification. "[T]estimony by a [police] witness that differs in material respects ... or that concerns an extrajudicial identification at a different time or place not acknowledged by the identifying witness cannot be considered corroborative or probative and remains within the hearsay proscription." Commonwealth v. Daye, supra, at 60 n.8 (emphasis added).